**UNITED STATES of America,**
**Plaintiff,**

v.

**NORTHERN PACIFIC RAILWAY COM-**
**PANY and Continental Oil Com-**
**pany, Defendants.**

**Civ. No. 4084.**

United States District Court
D. Wyoming.

Jan. 19, 1959.

John F. Raper, U. S. Atty., Cheyenne, Wyo., and Alvin E. Bielefeld, Field Solicitor, Dept. of Interior, Billings, Mont., for plaintiff.

W. J. Wehrli, Casper, Wyo., Robert N. Davidson, Billings, Mont., Robert C. Hawley and William M. Griffith, Denver, Colo., for defendants.

KERR, District Judge.

The United States brings this action to quiet title to a strip of land 150 feet wide traversing Section 35, Township 58 North, Range 98 West, of the 6th P.M., Park County, Wyoming, and comprising 30.12 acres.

For convenience and brevity the Northern Pacific Railway Company will be referred to as "Railway Company", the Continental Oil Company will be referred to as "Oil Company" and the United States will sometimes be referred to as "Government".

From the pleadings and evidence there emerges a single question: "Who owns the minerals underlying this strip of land?".

The basic facts can be stated and the relevant history briefly told as there appears to be no dispute as to the evidence in the case.

On July 2, 1864, Congress enacted a law (13 Stat. 365) granting to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of a railroad and telegraph line to the Pacific coast every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of the railroad line.

On August 30, 1890, Congress enacted a law (see Section 945, Title 43 U.S.C.A.) in which it was provided that in all patents for lands taken up after August 30, 1890, under any of the land laws of the United States, or on entries or claims validated by the Act of August 30, 1890, west of the one hundredth meridian that the Government should reserve from the lands patented a right of way thereon for ditches or canals constructed by the authority of the United States.

During the year of 1896 the Northern Pacific Railway Company acquired all of the property rights and interests of its predecessor, the Northern Pacific Railroad Company, including the rights authorized by the Act of July 2, 1864.

On June 17, 1902, Congress passed what is commonly referred to as the "Reclamation Act" (32 Stat. 388). This Act, among other matters, provided in Section 7, from which I quote:

"Sec. 7. That where in carrying out the provisions of this Act it becomes necessary to acquire any rights or property, the Secretary of the Interior is hereby authorized to acquire the same for the United States by *purchase or by condemnation* under judicial process, and to pay from the reclamation fund the sums which may be needed for that purpose, * * *". (Emphasis supplied.) 43 U.S.C.A. § 421.

Pursuant to the Act of Congress of 1864 the Railway Company selected Sec-

tion 35 as an indemnity selection and on August 20, 1908, the United States issued its patent to the Railway Company conveying Section 35 in fee but failed and neglected to make a reservation for an easement or right of way for ditches or canals to be constructed by the authority of the United States as authorized by the Act of August 30, 1890.

On October 23, 1916, following considerable correspondence between the Railway Company and the United States, reference to which will be later made in this memorandum, and after the United States had prepared and furnished to the Railway Company a metes and bounds description of the 150 foot strip of land, the Railway Company executed and delivered to the United States a deed in words and figures, as follows:

"Wyoming Division.
"Contract No. 158

Deed No. 21767E.
"Northern Pacific Railway

Company.
"*This Deed,* made the twenty-third day of October, in the year of our Lord, one thousand nine hundred and sixteen, by the Northern Pacific Railway Company, a corporation of the State of Wisconsin grantor, to United States of America, grantee, Witnesseth:

"The grantor, in consideration of the sum of one dollar ($1.00) unto it paid, in pursuance of the provisions of the Act of June 17, 1902 (32 Stat. 388), the receipt whereof is acknowledged, *grants, bargains, sells and conveys* unto the grantee and assigns, the following described tracts of land, situate in the County of Park and State of Wyoming, to-wit:
(Description of premises conveyed.)

"To Have and to Hold the said lands and appurtenances, unto the grantee and assigns, forever.
"*The grantor will forever Warrant and Defend the title to the premises.*

"In Witness Whereof, the Grantor has caused these presents to be sealed with its corporate seal, and signed by its President the day and year first above written.
"Northern Pacific Railway Company
"By Jule M. Hannaford,
"President.
"(Corp. Seal)
"R. H. Reef,
"Assistant Secretary.
"Signed, sealed and delivered in the presence of:
"E. W. Costello
"Russell H. Dick."
(Emphasis supplied.)

As will be observed from an examination of the above Deed, it contained neither exception nor reservation and no language indicating the land was conveyed for right of way or easement purposes only. The form of the deed is in substantial compliance with 66–201, 66–202, Wyoming Compiled Statutes, 1945.

Since the Railway Company rests its defense largely upon the correspondence exchanged between the parties prior to the execution of the deed it is appropriate to quote from the correspondence preceding the issuance of the above deed. On July 6, 1916, the Government advised the Railway Company, as follows:

* * * "An examination of the records of the United States Land Office shows that entry for this land was made subsequent to October 2, 1888, and that it is accordingly subject to the following provision of law:

" 'That in all patents for lands hereafter taken up under any of the land laws of the United States or on entries or claims validated by this act west of the one hundredth meridian, it shall be expressed that there is reserved from the lands in said patent described, a right of way thereon for ditches or canals constructed by the authority of the United States.' (Act of Aug. 30, 1890–26 Stat. L., 391.)

"The entries or claims validated by that Act are such as may be asserted under entries made subsequent to October 2, 1888, as held by the Department in the circular of October 5, 1893. (See Vol. 17, p. 521, of the Decisions of the Department of the Interior relating to public lands.)

"It is intended to exercise the right conferred by this law, and to take the necessary *right of way across the said lands* for the construction and maintenance of the ditch or canal required in connection with the reclamation work authorized under the act of June 17, 1902." * * * (Emphasis supplied.)

On the same day the Government advised the Railway Company in another letter, as follows:

"In the construction of the Shoshone Project the Frannie or Northern Unit is to be developed this season, and in locating and constructing canals it appears that the Frannie Canal will cross Section 35, Township 58 North, Range 98 West, Sixth Principal Meridian, which is shown upon the project records to be in the ownership of the Northern Pacific Railway Company.

"It is the understanding of this office that this was an indemnity selection and as such is subject to the reservation contained in the act of August 30, 1890 (26 Stat., 391) and in such case this office is required to give notice on the form enclosed."

On July 12, 1916, the Railway Company in an inter-office memorandum stated:

"The Courts have decided that patents can only be issued where there is legislative authority for so doing, and that patents issued without such legislative authority are void, so that it may be that this patent may be held to be valid to the extent that congress had authorized its issuance; but, invalid as to that part where there had been a congressional prohibition; that is to say, invalid as to the *right of way*.

"As we have not sold this parcel of land and the District Counsel states that his understanding is that the government has the *right of way,* and asks to be advised if he is correct; it seems to me that we may avoid the question in the particular case by offering to *give the government the right of way* if they will indicate just what the government requires. We should arrange with Mr. Penn so that the *easement* we have agreed to give him for his oil pipe line will not conflict with the government canal.

"This brings up the question of the desirability of inserting in all our contracts for sale of indemnity lands west of the one hundredth (100th) meridian—an exception of the rights in the United States contained in the Act of August 30, 1890 with reference to ditches and canals regardless of whether our patents contain the reservation or not. We are now inserting such a clause in contracts for the sale of lands patented with the reservation, but the position now taken by the government seems to require us to protect all sales by a reference to the provisions of the Act of 1890." (Emphasis supplied.)

On July 13, 1916, the Railway Company advised the Government, as follows:

"Your letter of July 6th, addressed to Mr. Cooper has been received during his absence on a trip to the Pacific Coast. This is the first intimation that we have had that the Shoshone Project of the Reclamation Service affected in any way this company's property in Section 35–58N–98W. You are correct in stating that the Northern Pacific owns this land. We acquired it by patent dated August 20, 1908, under indemnity selection filed November 28, 1906. We have not sold this prop-

erty but we have agreed to issue an easement for an oil pipe line there-across. Whether or not there is conflict with the *right of way* desired by the Reclamation Service, I cannot say. Am now in communication with the pipe line company for more detailed information regarding the matter.

"The legal questions brought up by your letter will also be considered and by the time Mr. Cooper returns to the office we may have the data on hand to enable us to respond to you definitely. I am writing this letter as an explanation as to the delay which may ensue." (Emphasis supplied.)

Again, on July 21, 1916, the Railway Company in one of its memorandums said:

\* \* \*

"In view of Mr. Eggleston's statement that it is his understanding the United States owns the *right of way* required for the canal and there being nothing to interfere with our doing so, it is suggested that we offer to convey such *right of way* for a nominal consideration and thus settle the question. Do you approve?" (Emphasis supplied.)

Again, on August 5, 1916, the Railway Company advised the Government:

"Further answering your letter of July 6th, in regard to the *right-of-way* through Section 35–58N–98W, for the Frannie canal under the Act of August 30, 1890, I beg to say that our patent of August 20, 1908, under the selection filed November 28, 1906, does not contain a reservation of a *right-of-way* for ditches or canals constructed by authority of the United States; but I am not prepared to say that the United States has not retained this *right-of-way* even though it is not mentioned in the patent.

"There is no disposition on our part to object to the Government's

right in this particular case, as we are perfectly willing for the canal to be constructed, as we have not disposed of the land and the persons with whom we were negotiating for an easement for an oil pipe line across the section are content to subject their rights to those of the Government.

"May I suggest *that we give the United States a deed for such right-of-way* as it requires through the section for a nominal consideration, thus putting at rest any legal question that may be involved insofar as this case is concerned.

"Should my suggestion meet with your approval will you be good enough to furnish me a description of *the right-of-way required.*" (Emphasis supplied.)

Again, on November 11, 1916, the Railway Company advised the Government:

"Mr. Mason has handed to me your letter of November 8th regarding *the right of way* for ditch across section 35–58N–98W, Wyoming. *We have concluded to issue the deed* to the United States without making any reference to the easement granted to the Illinois Pipe Line Company. As soon as executed, the deed will be sent you." (Emphasis supplied.)

In an undated office memorandum made a part of the record of this case it is said by the Railway Company:

"This deed is issued to the United States covering *right of way* for the Frannie Canal of the United States Reclamation Service across land in section 35–58N–98W for a nominal consideration, for the following reason:

"Under Act of Congress dated August 30th, 1890, 26 Stats. at Large, page–391, lands which were public lands at that time west of the 100th standard Meridian of longitude were made subject to a *right-of-way for canals or ditches* con-

structed by U. S. authority. This has been construed by the United States and concurred in by our attorney to cover right of way for canals or ditches constructed by United States authority at any time after the passing of the Act and all patents issued since that date for lands within the indemnity limits of this company's grant are subject to this statutory provision, whether same is recited in the patent or not. Section –35 falls with this category, no reference being made in the patent to the statute. The United States Reclamation Service is constructing the canal across the land and invokes the statute for the *right of way. The deed is issued to vest the record title in the United States."* (Emphasis supplied.)

Other correspondence passing between the Government and the Railway Company make constant reference to "right of way" and "easement". There is no useful purpose in quoting further from the correspondence. Suffice it to say the general trend of the correspondence is reflected by the quotes from the above letters.

The parties have stipulated that the record in the assessor's office for Park county, Wyoming, discloses that the Railway Company filed assessment schedules for each of the years 1917 to 1927, inclusive, describing the lands to be assessed in Section 35 as "All less 30.12 ac. Canal R/W"; that for the years 1928 and 1929 the same records disclose that the Railway Company filed assessment schedules for each of said years describing the lands to be assessed in Section 35, as follows: " 'N½ less Canal R/W' 308.23 acres—'S½ less Canal R/W' 299.77 acres", and comprising for each year a total assessable acreage of 608 acres; for the years 1930 to 1952, inclusive, the records disclose that the Railway Company filed assessment schedules for each of said years, describing the lands to be assessed in said Section 35, as follows: "All less 32.00 ac. Canal R/W"; for the years 1953 and 1954 the

records disclose that the Railway Company filed assessment schedules for each of said years describing the lands to be assessed in said Section 35 as "All less 32.00 ac. Canal R/W and 0.76 ac. road" and comprising for each year a total assessable acreage of 607.24 acres.

On December 10, 1946, the Railway Company leased to the Oil Company "all of Section 35 * * * subject to the rights granted to the United States under deeds dated October 23, 1916, and June 9, 1920", said lease being for a period of ten years or so long thereafter as oil and gas might be produced according to the agreement.

In June 1947 the Oil Company obtained production of oil from said Section 35 but has never drilled upon the strip of land constituting the subject of this controversy. From 1947 to 1956 there was produced from seven oil wells on said section 1,500,359 barrels of oil.

On May 3, 1955, the Railway Company and the Oil Company made a joint demand upon the United States for reformation of the deed dated October 23, 1916, and while they admitted the deed conveyed the unlimited and unqualified fee simple estate of the Railway Company, they urged it was never the intention of the Railway Company or the United States that the deed convey more than an easement or right of way. On March 5, 1957, the United States denied the request for a reformation of the deed.

On April 19, 1957, this action was instituted. So far as material here the complaint alleges that the United States is the owner in fee simple, without reservation, of the strip of land hereinbefore mentioned and that neither the Railway Company nor the Oil Company has any right, title or interest therein; that the United States claims full title, not only under the deed to it of October 23, 1916, but that it has adversely held said strip of land against all the world and has acquired a fee simple title not only by said deed but through adverse possession for a long period of time under color of the 1916 fee simple deed.

Among the defenses interposed by the Railway Company and the Oil Company in their joint answer are these: that prior to the execution and delivery of the deed to the United States an agreement was reached by correspondence and conferences between officials and representatives of the government and the Railway Company, and that the patent issued to the Railway Company should have contained an express reservation of a right of way across said Section 35 in accordance with the provisions of the Act of August 30, 1890; that the reservation was omitted from the patent by apparent inadvertence of officials and representatives of the United States; that prior to October 23, 1916, an agreement which was not reduced to writing, except as it is reflected by the correspondence between the parties, was reached by the United States and the Railway Company and that the Railway Company would convey an easement or right of way across said section for ditches or canals to be constructed by the government; that in fulfillment of such agreement the Railway Company executed and delivered the deed of October 23, 1916, and it was the intent and purpose of the United States and the Railway Company that such deed should comprise only a conveyance of an easement or right of way for the Frannie Canal to be constructed upon the lands described therein but that through mutual mistake the deed was prepared and executed in the form in which it appears herein; that it was not the intent or purpose of the Railway Company to convey to the United States the title to any lands or the title to the oil, gas and minerals under the lands included in such right of way and neither was it the intent or purpose of the United States that it should receive from the Railway Company a conveyance of title in fee to said right of way.

The Government argues that the deed having been given on October 23, 1916, and the Railway Company having waited for a period of forty years, and until after the discovery of oil, before attempting to reform the deed makes the Railway Company guilty of laches and it should not prevail. The argument is worthy of consideration. The question of laches turns not simply upon the number of years which have elapsed between the giving of the deed and the attempt to reform the same but upon the change in value and other circumstances accruing during the lapse of these forty years. The cases are many in which this equitable doctrine has been invoked and considered. No one case becomes an exact precedent for another yet a uniform principle pervades them all. They proceed on the assumption that the party to whom laches is imputed has knowledge of his rights and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless or have been abandoned; that because of the change of conditions during the period of delay it would render an injustice to permit him to now assert them. (19 Am.Jur. 338.) Generally speaking, the courts refuse aid to one who has procrastinated in the assertion of his claim and allowed it to become stale. The courts have said the basis of the doctrine of laches is public policy which requires, for the peace of society, the discouragement of stale demands.

A parallel case to the case at bar was before the Supreme Court of Wyoming in Town of Glenrock v. Abadie, 71 Wyo. 414, 259 P.2d 766. In the Glenrock case Engelking entered into a written agreement with Skinner and his wife in February 1920 in which he agreed to sell and convey to the Skinners all of the surface rights and an undivided one-half interest in all minerals in and under certain real estate. On the same day the agreement was made Engelking executed a warranty deed to the Skinners but failed to make any reservation or exception of the mineral rights, as was agreed in the written agreement. Approximately a month later Skinners entered into an agreement with the town of Glenrock, in which they agreed to sell to the town a portion of the lands purchased from En-

gelking. In April 1920 the Skinners gave their deed to the town of Glenrock for the lands, without, however, making any reservation or exception of the mineral rights. On October 4, 1920, Skinners gave their warranty deed to Engelking purporting to convey an undivided one-half mineral interest in the lands. On June 6, 1921, the town of Glenrock, by its warranty deed, conveyed back to Skinners an undivided one-half mineral interest in the lands. On June 9, 1949, the town entered into an oil and gas lease covering the tract with the Phillips Petroleum Company. The town then brought its suit to quiet title to the tract, pleading its ownership and also title by adverse possession. Mrs. Skinner contested the action and filed a cross petition in an attempt to quiet title in an undivided one-half of the minerals. Judge Harnsberger, after reviewing many authorities on the subject of laches and adverse possession, brushed aside the contention of Mrs. Skinner and stated at page 432 of 71 Wyo., at page 772 of 259 P.2d:

"Further, there is no explanation or reason given by the respondent to excuse her omission to take action to establish her claim. The respondent did plead that certain representations had been made by the Town's officials—including its attorney—which might have constituted an equitable estoppel to plead limitations on the theory that the Skinners were led to believe by the Town officials that the Town made no claim to the minerals, but the record does not contain any evidence whatsoever to support such plea, and no other excuse for the respondent's negligence is offered.

."In the case at bar, more than thirty years had elapsed since the mistake—if any—was made. If the correction may be made at this time, it might be made fifty or a hundred years from now. That cannot be the law. Some force must be given to the statutes of limitation."

The case of Knoell v. Frisco Lease, Inc., 10 Cir., 78 F.2d 286, is somewhat in point. In the Knoell case the owners deeded to the St. Louis & San Francisco Railroad Company certain lands adjoining the right of way of the railroad company. Some thirty years later, and after the railroad company leased said premises for oil and gas, Knoell contended that the conveyance was actually for right of way purposes only even though the deed contained neither exception or reservation and no language indicating the land was conveyed for right of way purposes only. Judge Phillips speaking for the court stated at page 288:

"The deed of February 19, 1903, contained no words limiting the estate granted; it purported to convey an estate in fee simple. Therefore, it must be construed to have granted an estate in fee simple, unless the Railroad Company was prohibited from acquiring such an estate."

Kynerd v. Hulen, 5 Cir., 5 F.2d 160, involved the question of a right of way. Kynerd sought to quiet title and recover the value of oil extracted from two strips of land forming parts of a railroad right of way and the grantor took the position that the deed was given in order to avoid condemnation proceedings. The Court stated at page 161:

"Each of the deeds attacked is a full warranty deed. The granting clause describes land and not an easement. There is a suggestion that the words 'upon, over and across' in the granting clause refer to the land; but in our opinion they have reference to the railroad track, and there is nothing in the granting clause to sustain the theory that only an easement was intended to be conveyed. In construing any contract, the intention of the parties governs; and that rule is to be observed in construing a deed."

Gates v. Missouri, K. & T. Railway Company, D.C., 13 F.Supp. 466, is a case which arose in Oklahoma. The Railroad

Company instituted statutory condemnation proceedings to condemn land for railroad purposes. Following the suit the owner and the Railroad Company agreed upon a price and the owner conveyed the property in fee. After oil was discovered the grantor brought suit contending it was not the intention of the parties to convey the fee but only a right of way. Judge Kennamer stated at page 467:

"It is the position of the defendants that the warranty deed executed by the McCornacks to the Missouri, Kansas & Oklahoma Railroad Company conveyed a fee title to the land to the Missouri, Kansas & Oklahoma Railroad Company, and that its successor in title, the defendant Missouri, Kansas & Texas Railway Company, could lease the land for oil and gas purposes without restriction. On the other hand, the plaintiffs contend that the said deed was only a grant of the land for railroad purposes, and that the railroad company did not and could not take title to the oil and gas rights. An examination of the deed shows that it is a general warranty deed, without any reservation of any kind, and without limitation as to the character of interest conveyed."

The leading case on the subject of laches is Taylor v. Salt Creek Consolidated Oil Company, 8 Cir., 285 F. 532. This case arose in Wyoming. Judge Kenyon, after reviewing scores of cases on the subject, stated at page 537:

"In Brown v. County of Buena Vista, 95 U.S. 157, 24 L.Ed. 422, a delay of seven years precluded the action. In Holgate v. Eaton, 116 U.S. 33, 6 S.Ct. 224, 29 L.Ed. 538, two years, under the peculiar circumstances of that case, was held to be laches. See, also, Hayward v. National Bank, 96 U.S. 611, 618, 24 L.Ed. 855; Buchler v. Black, 9 Cir., 226 F. 703, 141 C.C.A. 459. These cases, without further multiplying them, sustain the doctrine fully that each case is determined by its own peculiar circumstances.

"The doctrine of laches is so firmly founded as a part of our jurisprudence that the court applies the same even though it may not be pleaded or the bill demurred to. In Willard v. Wood, 164 U.S. 502, 524, 17 S.Ct. 176, 181 (41 L.Ed. 531) the court held:

"'But the recognized doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time may be applied in the discretion of the court, even though the laches are not pleaded or the bill demurred to.'"

The Government also argues that it has full title not only under the deed but through adverse possession. It is not—and can not be—disputed that the Railway Company conveyed all of the minerals under the deed of October 23, 1916. No one disputes that the Government has been in possession of this strip of land for more than forty years prior to the commencement of this action.

Sections 3–501, 3–503 and 3–509, Wyoming Compiled Statutes, 1945, provide:

"*Recovery of real property—Ten year limitation.* An action for the recovery of the title or possession of lands, tenements or hereditaments can only be brought within ten (10) years after the cause of such action accrues."

"*Other than real actions required to be brought within limitation.* Civil actions other than for the recovery of real property can only be brought within the following periods, after the cause of action accrues."

"*Actions not otherwise limited.* An action for relief, not hereinbefore provided for, can only be brought within ten (10) years after the cause of action accrues."

In the Glenrock case, supra, the Court stated, 71 Wyo. at page 428, 259 P.2d at page 770:

"But, under our statute, actions at law and suits in equity are blended, and we have but one form of action called a civil action. Section 3–301, Wyoming Compiled Statutes, 1945. Under such a statute, at least in many states, the statutes of limitation apply in all actions, whether formerly denominated at law or in equity. 21 C.J. 251, note 77; 30 C.J.S. Equity § 131, p. 557, notes 16 & 17; Oakes v. Howell, 27 Howard's Prac. 145; Bryant v. Swetland, 48 Ohio St. 194, 206, 27 N.E. 100; Terry v. Davenport, 185 Ind. 561, 574, 112 N.E. 998. Thus, it is said in the Ohio case cited:

" 'It is firmly settled in this state that the statute of limitations applies to all civil actions, whether they be such as before the adoption of the Code of Civil Procedure were called actions at law or suits in equity, except certain specified actions which the statute expressly exempts from its operation; * * *.' 48 Ohio St. 194, 206, 27 N.E. 100, 103.

"Our statute of limitations does not specifically apply to a case such as before us. It has, as is true in many other states, a so-called residuary clause, 53 C.J.S. Limitations of Actions § 103, p. 1076, et seq., in Section 3–509, Wyoming Compiled Statutes, 1945, reading as follows:

" 'An action for relief, not hereinbefore provided for, can only be brought within ten (10) years after the cause of action accrues.' *Our statute was taken from Ohio, and it has been held that the statute quoted applies to an action for the reformation of an instrument.* Bryant v. Swetland, 48 Ohio St. 194, 27 N.E. 100. And, it is stated in 53 C.J.S. Limitations of Actions § 103, pp. 1076, 1078, that the residuary clause applies to actions ' * * * for the reformation of deeds and other instruments *on the ground of mistake* * * * '. See also Morris Plan Bank v. Scott, 176 Tenn. 496, 144 S.W.2d 741. Further cases,

holding that the statute of limitations applies to *correction of mistakes* in such instruments may be found in 1 Wood on Limitations (4th Ed.) pp. 299, 301; 53 C.J.S. Limitations of Actions § 91, p. 1069, note 8; 53 C.J.S. Limitations of Actions § 95, p. 1072, note 41. Under some statutes the action accrues when the mistake was made. Bryant v. Swetland, supra; Kithcart v. Metropolitan Life Ins. Co., 8 Cir., 150 F.2d 997, citing Missouri cases; Barnes v. Barnes, 157 Tenn. 332, 8 S.W.2d 481. Under other statutes the cause of action accrues when the mistake is discovered. In Travis v. Glick, 150 Kan. 132 [and 718], 91 P.2d 41, and 96 P.2d 624, *it is held that a person is deemed to have notice from the time that an instrument is recorded.* A case of interest herein is Kennedy v. Brown, Tex.Civ.App., 113 S.W.2d 1018, 1020, 1021. In that case, as in this, a contract provided that a deed for certain property should reserve certain mineral interest. The deed, made pursuant to the contract, did not contain the reservation. An action brought nine years later sought reformation of the deed. The statute provided that an action for reformation by reason of mistake should be brought within four years after discovery of the mistake. The court held that action was brought too late, stating among other things:

" '* * * *In the absence of circumstances which prevented him from reading it and informing himself of its contents, he was charged with knowledge of its provisions when he executed it, regardless of whether he read it or not.* It was unquestionably his duty to read it and inform himself of its provisions, and if he failed in that respect, the law charges him with full knowledge and notice of its contents. Williams v. Rand, 9 Tex.Civ.App. 631, 30 S.W. 509; Womack v. Western Union Tel. Co., 58 Tex. 176, 44 Am.Rep. 614;

Barclay v. Falvey, Tex.Civ.App., 100 S.W.2d 791; American Freehold Land Mortgage Co. v. Pace, 23 Tex. Civ.App. 222, 56 S.W. 377.

" ' * * * Even if appellee were not charged by law with knowledge and notice of the contents of the deed and the absence therefrom of the reservation of the mineral rights which constitutes the mistake of which he complains, we think nine years extends far beyond the time that would be considered reasonable for a man of ordinary prudence to have discovered he had been deprived of valuable property rights by a deed which was at all times accessible to him, and we cannot accede to the contention of appellee that he would not be charged with some degree of diligence unless something happened that would have the effect of calling it to his attention.

" ' * * * We perceive no reason why appellee should not have discovered the mistake in time to have had it corrected or brought his suit within the period of the limitation provided by the statute. The deed being of record in the public records of the county where the land was located and where appellee resided for several months after its execution, afforded him ample opportunity to read it and ascertain its provisions. We think it would be doing violence to the rule of reason if we should hold that a man of ordinary prudence who was looking after his property interests, as such a man would, is not charged with the duty of ascertaining a matter so vital and patent. * * *'. 113 S.W.2d 1018, 1020, 1021." (Emphasis supplied.)

It is true the Railway Company could not have instituted action against the Government to reform the deed, as it enjoys immunity from this type of action. No excuse is offered, however, for waiting thirty-nine years before it proceeded administratively, as it did on May 3, 1955, long after the Government was in possession of the premises.

It is unnecessary to decide whether the execution of the deed conveying the fee, following considerable correspondence referring only to an "easement" or "right of way" constituted negligence on the part of the grantor. The Supreme Court of Wyoming in State Bank of Wheatland v. Bagley Brothers, 44 Wyo. 244, 11 P.2d 572, had this to say with respect to inexcusable negligence in drafting a written instrument, on page 299 of 44 Wyo., on page 589 of 11 P.2d:

"An examination of the cases generally establishes the rule that, where a party to a written instrument is inexcusably negligent in its execution, he is not entitled to have it reformed to relieve him from the consequences. 45 A.L.R. 701, note."

The Railway Company meets this apparently impregnable possession of the Government with United States v. Ide, 10 Cir., 277 F. 373; Ide v. United States, 263 U.S. 497, 44 S.Ct. 182, 68 L.Ed. 407; Green v. Willhite, C.C., 160 F. 755; United States v. Van Horn, D.C., 197 F. 611; United States v. Minidoka Ry., C.C., 176 F. 762; Continental Oil Co. v. Chicago & North Western Ry. Co., D.C., 148 F.Supp. 411; 10 Cir., 253 F.2d 468; North Sterling Irrigation Dist. v. Knifton, Colo., 320 P.2d 968; Coulsen v. Aberdeen-Springfield Canal Co., 47 Idaho 619, 277 P. 542, and other cases. I have examined these cases with care and am not persuaded that they are applicable to the facts involved in the case at bar.

The photographs of a portion of Section 35 depict the land as arid and unproductive. A review of the record leads me to the conclusion that but for the event of oil discovery in commercial quantities it is unlikely any attempt to reform the deed would have been made by the Railway Company.

In summary, the facts are these: The deed was dated October 23, 1916. It conveyed to the United States without reservation or exception the fee simple estate of the 30.12 acres. It was recorded January 12, 1917. The Railway Company was charged with notice of the mistake; if it was a mistake, as of the

date of the recording. Oil was discovered in 1947. Request was made to reform the deed in 1955, after an elapse of thirty-nine years. The Government was in possession of the premises for forty-one years before the institution of this action.

 From what I have said I hold the Government is the owner in fee simple of the 30.12 acres and the minerals underlying said premises; that its title is derived from the deed of conveyance given by the Railway Company October 23, 1916. I further hold that the Government has been in open and adverse possession of said premises since October 23, 1916; that the Government is entitled to judgment quieting its title to the lands and the minerals thereunder.

The parties have entered into a compensatory royalty agreement dated April 18, 1955, as to the disposition of oil royalties dependent upon the outcome of this litigation, which makes it unnecessary for the Court to attempt to allocate the interests of the parties to the oil.

Counsel for the Government will prepare findings of fact, conclusions of law and judgment in conformity with this memorandum within twenty (20) days from the date of the filing hereof, and the Clerk will enter an order accordingly.